Steven PRESCOTT;  Robert F. Berry; Cheryl L. Jones; Karen Pierce; Christine M. Turney, Plaintiffs–Appellants,

v.

COUNTY OF EL DORADO;  Kathy Libicki; Local 1 El Dorado County Employees Association, Defendants–Appellees.

No. 98–15579.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1999.

Decided May 12, 1999.

W. James Young, National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, for the plaintiff-appellant.

Fred J. Hiestand, Sacramento, California, for the defendant-appellee.

Before: FERNANDEZ and McKEOWN, Circuit Judges, and WEINER,[1] District Judge.

Opinion by Judge FERNANDEZ; Concurrence by Judge McKEOWN.

1. Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

FERNANDEZ, Circuit Judge:

Steven Prescott, an employee of the County of El Dorado, California, appeals from a determination of the district court that granted him limited relief on his claim that the assessment of fair-share agency shop fees against him was not fair.[2] The fees were for the purpose of supporting the El Dorado County Employees Association, Local # 1 (EDCEA), the union which represents him and the other employees of the County who are in his bargaining unit. Prescott is not a member of the EDCEA. He objects to the district court's approval of the escrow provisions, its failure to order full restitution of fees, its remanding him to using the union's arbitration procedures, and its failure to strike down an indemnification provision under which the EDCEA protects the County against losses. We affirm in part, reverse in part, and remand.

## BACKGROUND

Prescott, an employee of the County, is covered by a collective bargaining agreement (CBA) between the County and the EDCEA. The CBA establishes an agency shop arrangement. Employees in the bargaining unit must either be members of the union or pay a fair-share agency fee. Those who are not members, but who must pay the fair-share fee, are sometimes referred to as nonmembers or fee payers. EDCEA is an affiliate of the Public Employees Union, Local # 1 (PEU), and all dues for the EDCEA are paid to PEU. Members dues amount to 1 percent of gross salary, up to a maximum of $34, plus $1 per pay period. It appears that fee payers are not charged the $1, which EDCEA receives and controls. EDCEA has 570 members and 114 fee payers; PEU has more than 9100 members and 482 fee payers.

In April 1995, EDCEA gave notice to nonmembers that the County would begin to deduct a fair-share fee from their paychecks, which amounted to 98 percent of the full union dues. That reflected PEU's determination that 98 percent of its expenditures were for chargeable activities, that is, activities which did benefit nonmembers. It explained that the union uses the fair-share fee to defray the costs incurred for both individual and group representation in employment relations with the County, and that the actual costs for nonchargeable expenditures were less than 2 percent. Nonmembers were also subject to a deduction equivalent to the union initiation fee (variously said to be $35 or $45). PEU's procedure was to collect the entire agency fee from all nonmember employees, but to place 2 percent of that fee into an interest bearing escrow account. The notice provided that if a nonmember did not agree with the computation "the Union will set aside 4% of the fair-share fee in an interest-bearing trust for each fee payer who registers his dissent, to be held in an escrow account...." It further explained that "[o]nce the fee payer has objected to the amount of the fees paid into escrow, he/she may demand that the fees [2%] paid to escrow be paid to them and their monthly agency fee reduced by that amount thereafter."

The notice included a schedule of PEU's projected expenditures for the 1995 fiscal year, based upon expenditures for the 1994 fiscal year. Those were, it was said, reported "on a [PEU] wide basis...." The fund resulting from the $1 per member fee retained by the EDCEA, which Prescott estimates at nearly $15,000 annually, was not separately mentioned in this, or other, financial schedules.[3] The projection identified the major categories of expenses and an asterisk was placed next to those categories which the union identified as "nonrepresentational expenditures," including (1) ideological expenditures, (2) social events, gifts and donations, (3) contributions to political education fund, and (4)

---

**2.** Robert E. Barry, Cheryl L. Jones, Karen Pierce and Christine M. Turney also appeal. What we hold regarding Prescott applies equally to them.

**3.** The letter did specify that the fees would be "98% of the 1% of the fee payers gross salary," while dues are "1% of gross salary, plus $1 per pay period."

blood bank. The notice explained that "[f]air-share fees do not include any expenses incurred for political action, social activities or organizing expenses. Organizing expenses are those incurred to bring new bargaining units into representation by [PEU]." The notice also included a statement of PEU's revenues and expenses for the 1994 fiscal year, which listed the major categories of expenses and indicated whether they were paid from the general operating fund or the political education fund. According to the 1994 statement, only contribution expenses and bank charges were paid by the political education fund. Contributions for political education and social events, gifts, etc., came from the general fund. The notice also included a letter from a certified public accountant, which reported that the 1994 statement was reviewed in accordance with standards established by the American Institute of Certified Public Accountants, and that it conformed with generally accepted accounting principles.

The district court agreed with Prescott to the extent that he objected to certain procedures that PEU had created for the purpose of challenging the fees. It, therefore, entered a preliminary injunction prohibiting the collection of fees until the procedures were corrected. *See, Prescott v. County of El Dorado*, 915 F.Supp. 1080, 1092 (E.D.Cal.1996) (*Prescott I*). They have been corrected, but the court, upon cross motions for summary judgment, made the injunction permanent.[4] Neither the County nor EDCEA has appealed from that judgment. The district court did not otherwise agree with Prescott, and granted summary judgment against him on the other issues. Thus, he has appealed.

## JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291.

■ We review the district court's grant of summary judgment de novo. *See Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). That, of course, means that we must determine for ourselves whether "genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law." *Id.* Insofar as Prescott attacks the indemnification provision between EDCEA and the County, standing is in question. We review standing questions de novo. *See San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1124 (9th Cir.1996).

## DISCUSSION

While the district court did grant partial relief to Prescott, it deflected his attacks on the adequacy of the financial statements regarding PEU's and EDCEA's income and expenses, about the size of the required escrow account, about the need for full restitution to Prescott, about the proper forum to decide whether the fair-share fee was fair, and about the propriety of the indemnification clause in favor of the County. In short, Prescott won a skirmish and continues to hold that piece of ground, but he lost the rest of the engagement. He asks us to come to his rescue. We shall, in part. In order to do so, we must survey the contours of the field adumbrated by the Supreme Court.

From the very beginning, the Court has expressed the view that, while it is appropriate to impinge upon objecting employees' freedom of choice in order to require those who share in the benefits of union representation to help "defray the expenses ... of collective agreements, [and] the expenses entailed in the adjustment of grievances and disputes," it is not appropriate to take their money "to support candidates for public office, and advance political programs" of the union. *International Ass'n of Machinists v. Street*, 367 U.S. 740, 768, 81 S.Ct. 1784, 1800, 6 L.Ed.2d 1141 (1961). And it is the union,

---

**4.** The parties indicated to the district court that the case could be decided on summary judgment. Although it was somewhat dubious, the court took them up on that.

not the employee, that bears the burden of demonstrating just what proportion of union expenditures is devoted to functions other than those which can properly be charged to dissenting employees. *See Brotherhood of Ry. and S.S. Clerks v. Allen,* 373 U.S. 113, 122, 83 S.Ct. 1158, 1163–64, 10 L.Ed.2d 235 (1963).

Those earlier cases involved the unique area of railroading, but when it was called upon to consider the area of public employee unions, the Supreme Court reached the same conclusions. Again, it recognized the fact that agency shop provisions do impinge upon an employee's freedom of choice, but emphasized the more potent fact that they counteracted the incentive to become a free rider, who refuses to contribute to the union while happily obtaining the benefits of union representation. *See Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 221–22, 97 S.Ct. 1782, 1792–93, 52 L.Ed.2d 261 (1977). Again, it declared that an objecting employee could not be forced to pay dues or assessments to support or advance the union's political or ideological causes, which were "not germane to its duties as collective-bargaining representative." *Id.* at 235, 97 S.Ct. at 1800. Then, in *Ellis v. Brotherhood of Ry. Airline & S.S. Clerks,* 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). The court summed up as follows:

> Hence, when employees such as petitioners object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive

representative of the employees in the bargaining unit.

*Id.* at 448, 104 S.Ct. at 1892.

So much for the substance, but what about the procedure? The Court addressed that question in *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), where it concluded that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310, 106 S.Ct. at 1078.

It is with these general principles in mind that we turn to the principal disputes in the agon between Prescott and the ED-CEA.

### A. *Explanation of the Basis of the Fee*

■ There can be little doubt that PEU did give a rather detailed notice and a goodly amount of explanation of the fee to the nonmember fee payers. But quantity is not necessarily quality, and Prescott claims that the notice fell short because the financial schedules were not properly verified. That the schedules were not audited can hardly be doubted, but EDCEA asserts that they need not be. The district court agreed. *See Prescott I,* 915 F.Supp. at 1089–90. We do not.

An accountant or auditor can provide three levels of service: a compilation, a review, or an audit. A compilation involves the preparation of a financial statement regarding which the accountant expresses no assurance of accuracy, completeness, or conformity with generally accepted accounting principles. Larry P. Bailey, *Miller GAAS Guide* 14.19–14.20 (1999). A review constitutes a higher level of service, resulting in an expression of limited assurance. In a review, an accountant relies on the representations of

management to issue a report "stating that he or she is not aware of any material modifications that should be made to the financial statement in order for it to be in conformity with" generally accepted accounting principles. *Id.* at 14.25; *see generally, id.* at 14.25–14.28. In contrast, an audit consists of sufficient independent examination to express an opinion on the fairness, in all material respects, of the financial statement. *Id.* at 1.03, 11.05–11.06. An audit, unlike a review, generally requires the accountant to assess the organization's internal control procedures, examine evidence supporting the amounts in the financial statement using an appropriate sampling frequency, observe inventories, and confirm accounts receivable. *Id.* at 14.25–14.26, 11.05–11.06; *see id.* at 9.03–9.31 (sampling techniques). Although audits may vary in procedures and sampling rates, and therefore in level of audit risk, *see id.* at 9.05–9.07, an audit, as opposed to a review, offers at least some verification of the amounts disclosed in the financial statement.

The Supreme Court has emphasized that, "[l]eaving the nonunion employees in the dark about the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect" them. *Hudson,* 475 U.S. at 306, 106 S.Ct. at 1076. In elaborating what sufficient information might be, the court said that, "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at 307 n. 18, 106 S.Ct. at 1076 n. 18. Later on, the Court returned to that theme when it spoke of the weight of "a certified public accountant's verified breakdown of expenditures . . . ." *Id.* at 310, 106 S.Ct. at 1077. And yet again the Court spoke of a determination made "on the basis of the independent audit," and stated that an escrow figure "must itself be independently verified." *Id.* at 310 n. 23, 106 S.Ct. at 1078 n. 23.

■ Those statements would seem to make it clear enough that what is required is a real independent verification of the financial data in question to make sure that expenditures are being made the way that the union says they are. For example, was an amount supposedly directed to "x" for negotiation expenses really dispersed to him, or did it go to "y", who is a union lobbyist? The district court did not believe that the Supreme Court really meant what it seemed to have said, but we have no doubt that the Court did understand its own use of language. This is not the first time that a court has said that.

Indeed, we said as much in *Knight v. Kenai Peninsula Borough School Dist.,* 131 F.3d 807 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2060, 141 L.Ed.2d 138 (1998). There we explained that "[t]he purpose of an audit is to have an independent accountant determine whether the union has actually spent the amounts of money it claimed to have spent on the chargeable activities." *Id.* at 813. We went on to reject an attempt by the union to rely on figures when "no independent accountant has determined whether [the union] actually spent the amounts it claimed to have spent on chargeable expenses in the unaudited report." *Id.* We held, therefore, that the union's notice did not satisfy *Hudson.* The holdings of other courts are to the same effect. *See Gwirtz v. Ohio Educ. Ass'n.,* 887 F.2d 678, 682 n. 3 (6th Cir.1989) ("[A]n auditor's role is to verify the expenditures made by the union so as to ensure that the expenditures that the union claims it made for particular expenses were actually made for those expenses."); *Andrews v. Education Ass'n,* 829 F.2d 335, 340 (2nd Cir.1987) (same). We do not see how a mere review of the union's records can offer the "verification" that the Supreme Court and we have spoken of. Audits are often required in the business and public arenas, where others seek assurance that the reviewed books of an organization really do reflect the concrete world transactions to which they refer. It is just that kind of assurance that

nonmembers are entitled to, even though it may prove somewhat costly to obtain it. As the Second Circuit has pointed out, it is not a question of balancing the cost to the union against the First Amendment rights of the fee payers. "Excessive cost cannot form the basis for allowing the union or the government to avoid *Hudson's* requirement that the procedures used by the union to allocate bargaining and administrative costs be carefully tailored to minimize the intrusion on the nonmembers' rights." *Andrews*, 829 F.2d at 339. In short, a true audit was required.[5]

A somewhat smaller, yet important, piece of the puzzle is the district court's reliance on what has been called the local union presumption. *See Prescott I*, 915 F.Supp. at 1088–89. That is based on the assumption that local union units have spent their budgets in at least as favorable a way from a nonmember's standpoint as the overall larger union unit with which they are affiliated. That scheme gives no real information about just how the more local units really did spend their funds, but it does avoid the need of detailed information at least at the notice level. *See Price v. International Union, United Auto., Aerospace & Agric. Implement Workers*, 927 F.2d 88, 93–94 (2d Cir.1991); *see also Finerty v. NLRB*, 113 F.3d 1288, 1289, 1291–92, (D.C.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 558, 139 L.Ed.2d 400 (1997). Besides the cost savings, it has been said that there is some justification for the presumption because an objector can challenge it, whereupon the burden of persuasion on the question of the local unit's expenditures will fall upon the union. *See Price*, 927 F.2d at 94. With all due respect, that seems to put the cart before the horse because the notice is supposed to allow the nonmember to decide if there is a problem in the first place.

██ The reason for the presumption seems to be that the larger unit (here PEU) will certainly spend more on nonchargeable expenses than the local union (here EDCEA). But we see no reason to assume that is true. Rather, we agree with the Sixth Circuit "that such a local union presumption is unconstitutional" because " 'the use of the local union presumption increases the risk that the reduced fee collection from the objector would be in excess of what is appropriate.' " *Lowary v. Lexington Local Bd. of Educ.*, 903 F.2d 422, 431 (6th Cir.1990) (citation omitted). As the Third Circuit has said, the point of the notice is not simply to tell nonmembers how the union went about its business. It is to provide "nonmembers with information sufficient to gauge the *propriety* of the fee." *Hohe v. Casey*, 956 F.2d 399, 410 (3d Cir.1992). Without conveying to nonmembers the information on EDCEA's major categories of expenses but, rather, assuming that they were the same as those of PEU, nonmembers were left "in the dark about the portion of the fee attributable to chargeable expenses and [were] placed . . . in the position of having to object to obtain the information needed to gauge the propriety of the fee." *Id.* at 411.

Nor can it be said that the amounts will always be so insignificant that *Hudson's* demand for something less than absolute precision will always be satisfied. After all, in this case the total set aside for dissenters' challenges did not exceed 4 percent, and the amount involved in subventions to the local units was over 2 percent. Moreover, we see little reason to assume that the local units will use the same degree of care as the larger unit when it comes to handling their finances.

We do not decide that each little unit in the PEU firmament must necessarily be subjected to a separate verified audit of its expenditures, but we do decide that some auditor verifiable methodology which is more than a presumption is required if PEU and EDCEA are to fulfill their notice obligations. That methodology must be utilized with an eye on the purpose of the notice in the first place, that is to allow Prescott and others a reasonable opportu-

5. We express no opinion on the exact type of    audit required under *Hudson*.

nity to gauge whether the money taken from them is being spent on chargeable expenses.

Because the unaudited schedules attached to the notice were insufficient, we must turn to consider what steps were then required to protect Prescott.

### B. *Restitution*

■ Prescott asserts that he must simply be given full restitution of all amounts collected from him, even though it must of necessity be true that some substantial portion of the fee was used for properly chargeable purposes. With. that extreme position we do not agree.

As we see it, the court in *Hudson* did not insist on anything quite so radical; it did not see complete restitution as apodictic. Rather, it reflected on the fact that an escrow account would help alleviate the danger of even temporary use of nonmember fees for improper purposes. *See Hudson*, 475 U.S. at 309, 106 S.Ct. at 1077. It pointed out that the escrow solution alone would not solve the whole problem, if the notice was insufficient or if the challenge procedure fell short. But, even then, it did not say that a 100 percent escrow was required, and it did not hold that the proper remedy was full restitution of all collected fees. *Id.* at 310, 106 S.Ct. at 1077–78. Prescott suggests that we have already decided that the remedy *is* restitution. We have done no such thing.

Prescott seeks to support his position by pointing to our decision in *Dean v. Trans World Airlines, Inc.*, 924 F.2d 805 (9th Cir.1991). There, an airline pilot was not satisfied with the notice he was given, so he unilaterally reduced the fee demanded by the union from $36 per month to $10 per month. *Id.* at 807. We agreed with him that the union had failed to institute the proper procedures. Thus, we said, "the union has no right to enforce an agency shop agreement to collect fees for use in any union activity beyond collective bargaining" and its failure to comply with *Hudson* "can serve as a justification for Dean's unilateral reduction of fees." *Id.* at

809. Nothing in that determination suggests that a nonmember employee is entitled to full restitution whenever the union stumbles in its efforts to comply with *Hudson*.

Similarly, in *Knight*, upon which Prescott also relies, we merely said that the union's failure to comply with *Hudson* meant that it "was not entitled to the fees that it collected." 131 F.3d at 815. We did not say that meant that the union could not receive any fees whatsoever, and we went on to say that the employee was entitled to relief, but that we would "leave the measure of damages and the suitability of other relief for the district court to determine in the first instance." *Id.* Had we believed that the measure was simply complete restitution, we could easily have said so, but we did not and we see no reason for laying down so draconian a rule.

In our opinion, the Seventh Circuit got it just right when it said that a demand for full restitution was punitive insofar as it sought to deprive the union of fees to which it was, doubtlessly, entitled. *See Gilpin v. American Fed. of State, County, and Mun. Employees*, 875 F.2d 1310, 1315 (7th Cir.1989). It continued:

> [T]he union negotiated on behalf of these employees as it was required by law to do, adjusted grievances for them as it was required by law to do, and incurred expenses in doing these things.... The plaintiffs do not propose to give back the benefits that the union's efforts bestowed on them. These benefits were rendered with a reasonable expectation of compensation founded on the collective bargaining agreement and federal labor law....

*Id.* at 1316.

In fine, we agree with the district court that full restitution would be inappropriate, even though PEU did fail to meet all of its *Hudson* obligations. Any other rule would tend to suggest that the full constitutionality of the procedures and results must be established before fees are deducted. That would, as the Third Circuit

has suggested, "render the escrow requirement," contemplated by *Hudson*, "completely unnecessary." *Hohe*, 956 F.2d at 406. That, of course, underscores an alternate source of protection for nonmember employees—the interest bearing escrow account itself.

### C. *The Escrow*

The district court determined that the escrow cushion created by PEU's procedures was sufficient because it appeared that nonchargeable expenses were only 2 percent and, upon objection, the union would set aside 4 percent of which half went directly back to the dissenting fee payer while the other 2 percent remained in escrow pending adjudication. *See Prescott I*, 915 F.Supp. at 1091. Prescott asserts that the size of the escrow is plainly insufficient, and we are inclined to agree with him. We will explain, although we will not undertake to determine the proper amount in the first instance.

As we have already held, the difficulty here is that the procedure was flawed at its inception because of the failure to use audited financial statements. That means that the union's sanguine assumption that nonchargeable expenses amount to a mere 2 percent is unverified and provides insufficient notice to those who wish to gauge the accuracy of the union's representations. Because the district court was satisfied with the notice, its satisfaction with the size of the escrow account followed.

Prescott was not able to point to much in the way of specific errors in PEU's calculations, but, then, if he was not left entirely "in the dark," *see Hohe*, 956 F.2d at 411, he was at least presented with a fuliginous vista. EDCEA was required to give him more illumination than it did. In many ways, "[i]t is certainly in the union's interest to disclose sufficient financial data and other information about the agency fee prior to objections by non-members. Spe-

cific substantiation of the agency fee should reduce objections by non-members. Ambiguity rarely will have this effect, however . . . ." *Tierney v. City of Toledo (Tierney III)*, 917 F.2d 927, 938 n. 9 (6th Cir.1990).

Due to its lack of proper verification, PEU's schedules failed in that respect. But that very failure meant, of necessity, that Prescott was unable to fully carry his burden of going forward with evidence of improper allocations. *See Air Line Pilots Ass'n. v. Miller*, 523 U.S. 866, ——, 118 S.Ct. 1761, 1768, 140 L.Ed.2d 1070 (1998). He did point to some anomalies, for example, newsletter expenses and subventions to local units like EDCEA. But who is to say what else lies buried beneath the surface of the merely reviewed books?

■ If a nonmember fee payer has carried the burden of pointing to questionable allocations, the burden of persuading the court that an expenditure was on the correct side of the line is with the union. It has the burden of persuasion because it is seeking to mulct an unwilling person for fees and must show its entitlement to them. *See Lehnert v. Ferris Faculty Ass'n.*, 500 U.S. 507, 524, 111 S.Ct. 1950, 1962, 114 L.Ed.2d 572 (1991); *Hudson*, 475 U.S. at 306, 106 S.Ct. at 1075–76; *Lowary*, 903 F.2d at 431; *Price*, 927 F.2d at 94.[6]

■ Because of the nature of the defect here, the amount in dispute for the purpose of setting up an escrow account is rather problematic. Of course, it is not satisfactory for a union to fail to make disclosures, and then comfortably sit back while the entire fee is escrowed and the nonmember employees are left to strike out at their antagonist like andabatae. *See Grunwald v. San Bernardino City Unified Sch. Dist.*, 994 F.2d 1370, 1375 (9th Cir. 1993). That, however, does not mean that an interest bearing escrow procedure is

6. No doubt the protesting employee may ultimately have a separate burden of persuasion on the issue of whether he, himself, actually overpaid. *See Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir.1982). We suppose that in most instances resolution of that issue will be parasitic on the determination regarding the union's allocation, but do not hold that is necessarily so.

improper, for there will be times when it is needed (even up to 100 percent) while the parties work out their differences. *See id.* at 1374; *Crawford v. Air Line Pilots Ass'n Int'l*, 870 F.2d 155, 161 (4th Cir.1989), *adopted en banc*, 992 F.2d 1295, 1302 (4th Cir.1993); *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989); *Andrews*, 829 F.2d at 338; *see also Gibson v. Florida Bar*, 906 F.2d 624, 631 (11th Cir.1990).

In this case, the union has not acted with abandon or insouciance; it has, instead, misunderstood the financial statement requirements which we now make plain. Nevertheless, it cannot be said that a mere 4 percent of the union's charges remains in reasonable dispute. We are dubious about the suggestion that the amount in dispute should be considered to be as high as 100 percent; surely PEU is using some substantial amount of the fees charged for plainly proper purposes. We say this with some trepidation, because it can easily be argued that unverified financial statements are like no information at all. Again, that does appear to overstate matters, and we do not think it our place to attempt to determine precisely how much should be set aside under the circumstances of this case. That, like other determinations in this area, is more properly for the district court in the first instance. *See Hudson*, 475 U.S. at 310, 106 S.Ct. at 1078.

Once it is recognized that further proceedings are necessary, the next question is: in what forum should those proceedings take place?

### D. *The Forum*

■ The district court determined that the disputes between EDCEA and Prescott over the allocation of expenses between those which were chargeable and those which are not must be handled through the arbitration procedure created by PEU pursuant to *Hudson*. In that it erred.

■ As we have said previously, "nonmembers are not required to exhaust union remedies to which they did not agree before challenging the chargeability determinations in federal court." *Knight*, 131 F.3d at 816. Since then, the Supreme Court has also so decreed. There is "no warrant for blocking dissenting employees from bringing their claims in federal court in the first instance, if that is their preference." *Miller*, 523 U.S. at ——, 118 S.Ct. at 1768. Therefore, "unless they agree to the procedure, agency-fee objectors may not be required to exhaust an arbitration remedy before bringing their claims in federal court." *Id.* at ——, 118 S.Ct. at 1769.

### E. *Indemnification*

■ Prescott finally complains about the district court's failure to accord him standing to object to the provision which required EDCEA to indemnify the County from any liability which arises out of deductions of fees from employee wages, and to provide a defense against any claims. We agree with the district court.

We have alluded to this issue before. In *Knight*, 131 F.3d at 817, we determined that a public entity did not even have a duty to fee payers until the union sought to take some action against them for failure to pay the fees. However, we declined to entertain an attack upon an indemnification provision because the issue had been waived by the failure to raise it in the opening brief. *Id.*

■ Here, the issue has not been waived, but Prescott hurdled that trench only to run into a standing revetment. In order to meet constitutional standing requirements, a plaintiff must establish three elements.

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical'...." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent ac-

tion of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted); *see also, Bennett v. Spear,* 520 U.S. 154, 167–71, 117 S.Ct. 1154, 1163–65, 137 L.Ed.2d 281 (1997); *Maricopa–Stanfield Irrigation & Drainage Dist. v. United States,* 158 F.3d 428, 433–35 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1802, 143 L.Ed.2d 1007 (1999). Prescott cannot meet these strictures.

While it can be assumed that Prescott suffered some injury when the fees were deducted from his paycheck, that is all he has shown. He certainly cannot show any connection between the indemnification agreement and that injury. The agreement does no more than place the ultimate cost of any impropriety in the notice and the procedures where it belongs—on the union, which seeks the fees. Just how any injury can be traced to the indemnification provision itself is entirely unclear, but for Prescott's claim that the provision will somehow cause the County to ignore its own duties. But that argument is no more than rank speculation, and any breach of the County's duty can hardly be said to be traceable to the indemnification provision itself.

Speaking of speculation, it can hardly be said that our striking down of the provision would lead to some irenic world wherein all fee deduction procedures were properly followed because someone would finally have an incentive to assure that they were. As EDCEA points out, someone—the union—already has that incentive in a powerful form. A failure to perform its duties properly "may result in its being unable to retain a portion of the fair share fee." *Hohe,* 956 F.2d at 412.[7] A failure to

comply may also involve the union in substantial and expensive litigation, witness this case which has been in progress for over three years and will not be over for some time yet. Moreover, Prescott can suffer no ultimate damage to his interests because nothing in the indemnification agreement will prevent him from collecting any costs, expenses or losses imposed upon him by reason of the defective procedure.

In short, it simply cannot be said that any injury suffered by Prescott is fairly traceable to the agreement, nor is the claim that our striking of the agreement would redress or prevent the injuries that he has suffered anything but speculative.

## CONCLUSION

In cases like this, the desire of unions to assure that everyone in the bargaining unit pays for the costs of the benefits conferred upon him runs up against the desire of employees to join and support what they like when they like. Thus, cases of this type can generate high emotions and lend themselves to philippics—the nonmember employees are sometimes called radicals or free riders and the unions are sometimes said to be insincere hypocrites who simply seek more money to manipulate. Here, however, no one claims that we face either sansculottes on the one hand or pecksniffians on the other. Rather, it is clear that we are dealing with individuals who have an honest dispute over what the Constitution requires.

There is nothing new about the requirement that PEU and EDCEA must send out a proper notice to all nonmember employees, but we now make it clear that the financial statements accompanying the notice must be audited (not merely reviewed) in order to *assure* that "the union has actually spent the amounts of money it claimed to have spent on the chargeable activities." *Knight,* 131 F.3d at 813.

---

**7.** It should be noted that in *Hohe* the court suggested that there was standing, but did not decide the issue. *Id.* at 411.

In the meantime, all disputed fees, and absent an audited statement that could be a very substantial portion of what the union has charged, must be deposited into an interest bearing escrow account. The district court must then determine just what is chargeable and what is not. However, full restitution of the fees is not required if, as we think will surely be the case, at least some portion will be allocated to properly chargeable expenses.

AFFIRMED in part, REVERSED in part, and REMANDED. The parties shall bear their own costs on appeal.

McKEOWN, Circuit Judge, concurring:

Although I agree that the PEU's notice does not satisfy the requirements of *Chicago Teachers Union, Local No. 1. v. Hudson*, 475 U.S. 292, 306, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), and that remand is therefore necessary, I write separately because I believe that the majority unnecessarily reaches the issue of the constitutionality of the local union presumption.

We all agree that the PEU's failure to provide audited verification of its expenses violates *Hudson*. Because it is clear that the local affiliate, EDCEA, cannot rely on the parent union's (PEU's) constitutionally insufficient data, we need not decide the issue of the constitutionality of the local union presumption. While the majority properly interprets the Supreme Court's decision in *Hudson*, it ignores the Supreme Court's strong warning against premature adjudication of constitutional questions:

As we have explained: If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.... It has long been the Court's considered practice not ... to decide any constitutional question in advance of the necessity of its decision ... or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.

*Clinton v. Jones*, 520 U.S. 681, 690 n. 12, 117 S.Ct. 1636, 137 L.Ed.2d 945 (internal quotation marks and citations omitted).

If the notice based on the parent union's data is legally deficient, then the derivative data is similarly tainted for notice purposes. The "doctrine of avoidance," *id.* at 690, requires that we not reach out to decide whether the local union presumption passes constitutional muster as a general matter when, on the facts presented here, the EDCEA's reliance on the PEU's data is itself constitutionally deficient. In light of our reversal, at this point, the majority is only speculating as to what local union data the EDCEA and the PEU might bring before the district court on remand.

In addition, I have no doubt about the good faith of the parties in presenting this case, and do not join in the majority's gratuitous (and, by its own recognition, inapt) commentary regarding the conduct of other litigants in "cases of this type."