213 F.3d 651 (D.C. Cir. 2000)
 Patrick Thomas, et al.,Petitioners
v.
National Labor Relations Board, Respondent
International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, Local 95, et al., Intervenors
 No. 99-1338 Consolidated with 99-1378
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued May 8, 2000
Decided June 9, 2000
 
 On Petitions for Review of an Order of the National Labor Relations Board
 Glenn M. Taubman argued the cause for petitioners. With him on the briefs was W. James Young.
 Fred B. Jacob, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Supervisory Attorney.
 James B. Coppess argued the cause for intervenors. With him on the brief were Michael B. Nicholson and Laurence Gold.
 Before: Edwards, Chief Judge, Randolph and Garland, Circuit Judges.
 Opinion for the Court filed by Chief Judge Edwards.
 Edwards, Chief Judge:
 
 
 1
 The petitions for review in this case challenge an order of the National LaborRelations Board ("NLRB" or "the Board") dismissing a complaint alleging a breach of a union's statutory duty of fair representation ("DFR"). Petitioners are individual employees who are represented in collective bargaining by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("the Union"); petitioners are not members of the Union, however. The "Union" in this case includes two related entities: the International, which is the organizational body that coordinates the Union's activities and is also the collective bargaining agent for represented employees; and local chapters, which carry out the policies of the International. As nonmembers, petitioners may insist that their union dues and fees be used only to defray costs of collective bargaining and contract administration, not for "nonrepresentational" activities such as political or ideological advocacy. Nonmembers who so insist are charged a reduced "agency fee" that is intended to correspond only to that portion of the Union's expenditures used for representational activities.
 
 
 2
 In the principal petition for review, several nonmembers claim that the method used by the Union to determine the percentage of dues and fees expended on representational activities (and, concomitantly, the reduced agency fee owed by nonmembers) violates the Union's duty of fair representation. The complaint before the Board charged that the Union unlawfully used a "local presumption" to calculate fees owed by nonmembers. Under the disputed local presumption, the Union first determined the percentage of dues and fees expended by the International on representational activities; the Union then assumed that the International and local chapters spent the same proportion of their fees on chargeable activities, even though Union records indicated that local chapters routinely spend a greater proportion of their fees on chargeable activities. The Board found that the Union's use of a local presumption was not a violation of the Union's duty of fair representation. See International Union, United Auto., Aerospace and Agric. Implement Workers, 328 N.L.R.B. No. 175, 1999 WL 632712 (1999) ("Order").
 
 
 3
 The second petition for review involves a complaint that George Gally, a nonmember of the Union since 1985, was unlawfully discharged for failure to pay union dues. The complaint before the Board alleged that Mr. Gally was entitled to a notice stating the amount by which his fee would be reduced if he filed an objection to the fee, as well as an explanation as to how the reduced fee was calculated. Unlike the other petitioners, Mr. Gally never filed an objection to the union fees, and he was terminated for nonpayment of full union dues. The Board upheld the discharge of Mr. Gally, finding that the duty of fair representation does not require that potential objectors be apprised of the percentage of funds spent by the Union on nonrepresentational activities. See Order, 1999 WL 632712, at *6-7.
 
 
 4
 We uphold the Board's decision as to the local presumption, grant Mr. Gally's petition, and remand the case to the Board for an appropriate remedy. The Board determined that, under the particular circumstances of this case, the Union's application of a local presumption was not arbitrary, discriminatory, or in bad faith. There was substantial evidence presented in the record to support this conclusion. The Board concedes, however, that Mr. Gally's petition must be granted given this court's recent decision in Penrod v. NLRB, 203 F.3d 41 (D.C. Cir. 2000).
 
 I. Background
 
 5
 The facts of this case are straightforward and undisputed. Petitioners work for a number of different employers with whom the Union engages in collective bargaining as the lawful bargaining agent for represented employees. The petitioners, however, chose to become or remain nonmembers of the Union. The Union receives dues and fees from all employees inrepresented bargaining units. The dues and fees normally are collected by local chapters, which retain 38% of the money and remit 62% to the International. The locals remit an additional 3% of collected monies to the International's Community Action Program, thus reducing the locals' share of dues and fees to 35%. Both the locals and the International spend funds to defray costs of collective bargaining and contract administration and also to support nonrepresentational activities such as lobbying and political campaigning. The Supreme Court has held, in Communications Workers v. Beck, 487 U.S. 735 (1988), that nonmembers of a union may request that their dues and fees be reduced by the percentage of funds allocated by the union to nonrepresentational activities. Individuals who make such a request have come to be known as "Beck objectors."
 
 
 6
 In 1989, the Union established a two-step Beck "objection procedure" for nonmembers. In the first step, a nonmember who objects to paying fees for nonrepresentational activities receives the Unions' Report of Expenditures in Providing Collective Bargaining Related Services ("Report"). In the second step, an objector who is not satisfied with the Report can, within 45 days after the Report is issued, file a written objection which is then submitted to a neutral arbitrator for resolution. All claims submitted to arbitration are governed by the rules of the American Arbitration Association. During the pendency of a nonmember's claim, the Union is required to place the disputed fees in an interest-bearing escrow account. In any case in arbitration, the Union bears the burden of establishing the accuracy of its fee calculation.
 
 
 7
 Petitioners in this case (except for petitioner George Gally) filed Beck objections, requesting an accounting of the Union's nonrepresentational expenditures. None of the petitioners, however, invoked the arbitration process. Petitioner Gally never filed an objection, opting instead to cease paying dues in 1990. Under the applicable union-security clause, covering the bargaining unit in which Mr. Gally worked, a failure to pay dues was grounds for termination. At the Union's request, Mr. Gally was terminated on April 9, 1991. Subsequently, on April 12, 1991, Mr. Gally filed a charge with the Board challenging his termination, and requesting reinstatement and back pay.
 
 
 8
 In June 1992, the Union provided the required Report to each Beck objector. The Report calculated the Union's expenditures on representational and nonrepresentational activities for the 1991 fiscal year. The Report also contained a certified public accountant's audit of the International's financial records, and detailed how the 65% of fees received by the International was spent. The Report provided no breakdown of the monies spent by the Union's local chapters. The Union explained this absence by invoking the so-called "local presumption," stating:
 
 
 9
 This report will not attempt separately to analyze the expenditures of each of the Local Unions in which UAW-represented employees participate.... Because of the accounting and reporting difficulties inherent in attempting to analyze separately the expenditures of each of the Local Unions, this Report will analyze only the expenditures of the International Union, UAW. The same pro rata allocation between Chargeable Expenditures and Remaining Expenditures determined for the International's expenditures will then be applied to that portion of the dues and fees retained by the various Local Unions involved.
 
 
 10
 This procedure is justified because the vast majority of the UAW's Remaining Expenditures activities, including especially political lobbying and organizing, are funded and conducted by the International Union. Compared to the International, Local Unions thus invariably expend a greater portion of the resources performing Chargeable Expenditure activities such as bargainingcontracts, handling grievances, conducting arbitration hearings and otherwise administering collective bargaining agreements. By applying the same allocation of Chargeable Expenditures and Remaining Expenditures to the Local Unions as that determined for the International Union, therefore, Objectors covered by NLRA union security agreements are being required to pay a smaller amount than would be the case if each Local Union's expenditures were separately analyzed.
 
 
 11
 Report of Expenditures Incurred in Providing Collective Bargaining Related Services for Fiscal Year 1991, at 3-4, reprinted in Appendix ("App.") 58-59.
 
 
 12
 Petitioners filed charges with the NLRB, arguing that the Union's application of the local presumption violated the Union's duty of fair representation and, therefore, was an unfair labor practice. Petitioners requested that the union security clause be struck from the Union's collective bargaining agreements, that each employee be notified of his rights under the NLRA, and that petitioners be given complete restitution of all agency fees, with interest. On October 26, 1992, the General Counsel issued a consolidated complaint against the Union and its locals, contending that the Union violated S 8(b)(1)(A) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. S 158(b)(1)(A) (1994), by relying on a "factually unsupported 'local presumption.' "The General Counsel also alleged that Gally's termination constituted an unfair labor practice under S 8(b)(1)(A) and S 8(b)(2) of the Act, 29 U.S.C. SS 158(b)(1)(A), (b)(2), because the Union did not provide Gally with sufficient information to decide whether to file a Beck objection. On June 10, 1993, the General Counsel moved both to transfer the case to the Board and for summary judgment. On June 16, 1993, the Board issued an order transferring the case to the Board and a Notice to Show Cause why the motion for summary judgment should not be granted. All parties filed briefs in response.
 
 
 13
 On August 16, 1999, the Board issued its decision dismissing the complaint. The Board agreed that "the use of a totally unreasoned or unsupported local presumption would not meet a union's duty of fair representation, because it would not provide objectors with sufficient information to enable them to decide whether or not to challenge the union's figures." Order, 1999 WL 632712, at *5. The Board went on to find that the Union "provided adequate support for [its] use of the local presumption in this case." Id. The Board stated that the Union's justification (i.e., that local chapters expend a greater proportion of their funds on representational activities than the International) explained why the local presumption "is justified under the circumstances." Id. The Board found that, because the Union computed the amount of chargeable activities conducted by each local based on the International's actual expenditures, "the objecting employees will likely pay less in dues and fees." Id. The Board noted further that the employees had a remedy if they thought otherwise: "[T]hey can lodge a challenge, and the Local will be put to its proof." Id. In dismissing the complaint, the Board held that the use of the local presumption "was not arbitrary, discriminatory, or in bad faith, and therefore does not violate the [Union's] duty of fair representation." Id. Finally, the Board held that Gally was not unlawfully terminated, because he had no right to receive information regarding the percentage of funds spent by the Union on nonrepresentational activities until after he filed a Beck objection. See id. at *6-7.
 
 II. Analysis
 A.Gally's Petition
 
 14
 After Mr. Gally's petition for review had been filed, the court issued Penrod, holding that potential objectors like Mr. Gally are entitled to be informed of the amount by which their fees would bereduced were they to become Beck objectors. See Penrod, 203 F.3d at 47-48. Board counsel acknowledges that the Penrod decision controls the disposition of Mr. Gally's petition, because the Union never provided the required information to Mr. Gally. It is unclear, however, whether Mr. Gally is entitled to the remedy he seeks, given the Supreme Court's holding that objecting nonmembers are not excused from paying disputed agency fees until a final judgment is rendered in their favor. See Brotherhood of Ry. & S.S. Clerks v. Allen, 373 U.S. 113, 120 (1963). Accordingly, we grant Mr. Gally's petition for review and remand the case to the Board to determine an appropriate remedy for the Union's statutory violation. See South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs, 425 U.S. 800, 805-06 (1976) (per curiam) (holding that appeals court usurped role of NLRB by reversing Board's legal conclusion and proceeding to decide issue of fact that should be decided by Board in the first instance).
 
 B. Beck Objectors' Petition for Review
 1.Standard of Review
 
 15
 The complaint in this case contends that the Union breached its statutory duty of fair representation. Duty of fair representation claims are somewhat of an oddity under the NLRA. This is so because the NLRA, like the Railway Labor Act, 45 U.S.C. SS 151-188 (1994 & Supp. IV 1998), has no express provision establishing a duty of fair representation or declaring a DFR breach to be an unfair labor practice. Rather, DFR is a judicially-crafted doctrine that was first recognized (in an application of the Railway Labor Act) by the Supreme Court in Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 204 (1944), in the context of a union's negotiation of an agreement that included racially discriminatory provisions. The duty "has grown enormously in scope since 1944, however, from avoiding racial discrimination to providing daily representation." International Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. v. NLRB, 675 F.2d 1257, 1264 (D.C. Cir. 1982). The scope of DFR under both the Railway Labor Act and the NLRA is similar. See Davenport v. International Bhd. of Teamsters, 166 F.3d 356, 361 n.4 (D.C. Cir. 1999) (noting that "[c]ases describing the scope of the duty freely cite precedents under both statutes"); see generally The Changing Law of Fair Representation (Jean T. McKelvey, ed., 1985).
 
 
 16
 A union breaches its duty of fair representation when its conduct toward represented employees is "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967). In the instant case, petitioners' complaint is properly understood as a claim that the Union's use of the disputed local presumption is arbitrary. There is no contention that the Union acted pursuant to some "bad faith" motive or that the Union has somehow engaged in unlawful "discrimination." Rather, an allegation of arbitrary action is at the heart of the complaint here.
 
 
 17
 In considering DFR complaints that are premised on assertions of arbitrary action, the courts and the Board accord deference to a union, finding a DFR breach only if the union's action "can be fairly characterized as so far outside a 'wide range of reasonableness' " that it is entirely irrational. Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). The Board does not require that a union prove "that the choices it makes are better or more logical than other possibilities," but, instead, that the union "act[s] on the basis of relevant considerations," not arbitrary ones. Reading Anthracite Co., 326 N.L.R.B. No. 143, 1998 WL 726724, at *2(1998); see also Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 45-46 (1998) (making it clear that a union has "room to make discretionary decisions and choices, even if those judgments are ultimately wrong"). Indeed, even though the standard is based in principles of "reasonableness," proof of negligence does not establish a breach of the duty. See Le'Mon v. NLRB, 952 F.2d 1203, 1205 (10th Cir. 1991).
 
 
 18
 Just as the Board reviews the Union's actions with deference, we accord substantial deference to the Board's decision. We will set aside a decision of the Board only if it "acted arbitrarily or otherwise erred in applying established law to the facts" at issue, International Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB, 41 F.3d 1532, 1536 (D.C. Cir. 1994) (internal quotation marks omitted), or if its findings are not supported by "substantial evidence," 29 U.S.C. S 160(f) (1994). In the context of this case, the substantial evidence standard is most pertinent. See Boiler makers Local No. 374 v. NLRB, 852 F.2d 1353, 1358 (D.C. Cir. 1988) (reviewing Board's duty of fair representation decision under substantial evidence standard); see also Le'Mon, 952 F.2d at 1205-06 (reviewing for substantial evidence where Board found no breach of duty); Tenorio v. NLRB, 680 F.2d 598, 601 (9th Cir. 1982) (reviewing for substantial evidence where Board found no breach of duty).
 
 
 19
 Substantial evidence "is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Micro Pacific Dev. Inc. v. NLRB, 178 F.3d 1325, 1329 (D.C. Cir. 1999) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This court will uphold the Board's decision upon substantial evidence even if we would reach a different result upon de novo review. See Perdue Farms, Inc., Cookin' Good Div. v. NLRB, 144 F.3d 830, 834-35 (D.C. Cir. 1998). In undertaking substantial evidence review, we consider not just the evidence that supports the Board's decision, but any evidence in the record that "fairly detracts from its weight." Tenorio, 680 F.2d at 601. The posture of the instant case calls for singular deference, as petitioners must show that there was a lack of substantial evidence to support the Board's finding that the Union's actions fell within a broad range of reasonableness.
 
 
 20
 The significant nature of the deference due to the Board in DFR cases is cogently explained by Chief Judge Posner in International Ass'n of Machinists & Aerospace Workers v. NLRB, 133 F.3d 1012, 1016 (7th Cir.), cert. denied sub nom. Strang v. NLRB, 525 U.S. 813 (1998). Chief Judge Posner's opinion aptly observes:
 
 
 21
 All the details necessary to make the rule of Beck operational were left to the Board, subject to the very light review authorized by Chevron. It is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules for translating the generalities of the Beck decision ... into a work able system for determining and collecting agency fees.
 
 
 22
 133 F.3d at 1015. We agree. In other words, given the nature of the DFR doctrine, a court reviews with deference a Board decision that was itself made with deference to the Union. This does not mean that our review is toothless but merely that we must be very cautious in entertaining an invitation to reverse the Board.
 
 2.The Merits of Petitioners' Arguments
 
 23
 The Union and petitioners' employers have negotiated through collective bargaining "union-security clauses" that permit the Union to collect fees from all represented employees, even those who elect not to join Union membership. The SupremeCourt has held that the collection of fees is permissible, subject to certain limiting conditions. In Abood v. Detroit Board of Education, 431 U.S. 209 (1977), the Supreme Court ruled that a union representing public employees could collect "agency fees" from nonmembers, but that nonmembers had a constitutional right not to have any portion of their fees used for nonrepresentational, ideological activities. 431 U.S. at 234. Subsequently, in Chicago Teachers Union v. Hudson, 475 U.S. 292 (1986), the Court explained how this balance must be struck:
 
 
 24
 Basic considerations of fairness, as well as concern for the First Amendment rights at stake, ... dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. Leaving the nonunion employees in the dark about the source of the figure for the agency fee--and requiring them to object in order to receive information--does not adequately protect the careful distinctions drawn in Abood.
 
 
 25
 475 U.S. at 306.
 
 
 26
 The Court in Hudson found the information given nonmembers inadequate, because it did not "identify[ ] the expenditures for collective bargaining and contract administration that had been provided for the benefit of nonmembers as well as members--and for which nonmembers as well as members can fairly be charged a fee." Id. at 306-07. The Court explained:
 
 
 27
 We continue to recognize that there are practical reasons why "[a]bsolute precision" in the calculation of the charge to nonmembers cannot be "expected or required." Thus ,for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. With respect to an item such as the Union's payment of $2,167,000 to its affiliated state and national labor organizations, for instance, either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required.
 
 
 28
 Id. at 307 n.18 (citations omitted) (alteration in original).
 
 
 29
 For our purposes, the most recent piece of the puzzle was added by Beck. The Court's decision in Beck extends the logic of Abood, which rested on constitutional grounds, to the statutory DFR context. The Beck Court concluded that S 8(a)(3) of the NLRA "authorizes the exaction of only those fees and dues necessary" for the union to perform its duties as the exclusive representative of employees on labor management issues. 487 U.S. at 762-63. Accordingly, the Court held that nonmembers may bring a claim for improperly charged agency fees as a breach of the duty of fair representation. See id. at 745. Beck does not purport to enunciate procedures by which unions are to verify their calculations of the proportion of agency fees attributable to representational activities.
 
 
 30
 This case is framed by the axes of Hudson and Beck. Hudson establishes the procedural grounds by which unions representing public employees must defend their apportionment of charges for representational and nonrepresentational activities. Beck establishes that private sector nonmember employees may bring an action, based on the union's duty of fair representation, contesting the use of agency fees for nonrepresentational activities. Although Hudson involved constitutional concerns, this court has applied the basic protections of Hudson to the Beck-defined DFR cases involving private sector employees. See Abrams v. Communications Workers, 59 F.3d 1373, 1379 n.7 (D.C. Cir.1995); see also Miller v. Air Line Pilots Ass'n, 108 F.3d 1415, 1424-25 (D.C. Cir. 1997) (remanding for District Court to resolve factual dispute as to whether audit met Hudson's requirements), aff'd on other grounds, 523 U.S. 866 (1998). This court also has held that Beck objectors are entitled to the same procedural protections described in Hudson for challenging a union's apportionment. See Ferriso v. NLRB, 125 F.3d 865, 869-70 (D.C. Cir. 1997). None of these cases, however, addressed the issue raised here: May a union use a local presumption to allocate between representational and nonrepresentational activities?
 
 
 31
 Petitioners' complaint rests on two principal arguments. First, petitioners contend that the use of a local presumption can never be squared with Hudson. Second, petitioners contend that the Union's use of the local presumption in this case was factually unsupported. Respondent contends that we may not consider the first argument, because it was not part of the complaint before the Board. While it is true that both petitioners and the General Counsel distanced themselves rhetorically from a per se assault on the local presumption, a fair reading of the General Counsel's arguments before the Board, and petitioners' arguments before this court, belie this claim. The General Counsel, for instance, stated that a local presumption is "factually supported" only when the Union "demonstrate[s] that the local spent at least as great a proportion of its total expenditures for chargeable purposes as did the [I]nternational." Br. of Counsel for the General Counsel to the NLRB 23, reprinted in App. 288. Under this formulation, there would be nothing left of the presumption. Accordingly, we will address both contentions raised by petitioners.
 
 
 32
 On the first point, we reject petitioners' claim that a local presumption is per se unlawful. Indeed, the law of the circuit is clear on this point, for this court previously has approved the use of a local presumption. See Finerty v. NLRB, 113 F.3d 1288 (D.C. Cir. 1997). The petitioners in Finerty challenged the Communications Workers of America's ("CWA") calculation of chargeable versus non-chargeable activities, because it was based on the CWA's national expenditures, and not broken down unit-by-unit. The court, relying on Lehnert v. Ferris Faculty Association, 500 U.S. 507, 524 (1991), upheld the Board's finding that such notice did not violate the CWA's duty of fair representation. Finerty observed that
 
 
 33
 judicial precedent supports the Board's finding that use of a "local presumption" in allocating expenses--i.e., an assumption that allocation on a union-wide basis isequivalent to allocation on a unit-by-unit basis--is reasonable.113 F.3d at 1289 (emphasis added).
 
 
 34
 In upholding the use of the local presumption, the decision in Finerty was guided by Price v. International Union, United Automobile, Aerospace & Agricultural Implement Workers, 927 F.2d 88 (2d Cir. 1991). See Finerty, 113 F.3d at 1292. Price, in fact, involved the same fee reduction procedure at issue in the instant case. Both Price and Finerty place emphasis on the Supreme Court's observation in Hudson that " '[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.' "See id. (quoting Price, 927 F.2d at 94 (quoting Hudson, 475 U.S. at 307 n.18)).
 
 
 35
 Admittedly, Finerty did not squarely face the issue presented here. In Finerty, the Union took all of its expenses, separated them into chargeable and non-chargeable expenses, and assumed that this proportion would apply throughout all of its units. Here, the Union has conducted an audit of only
 
 
 36
 65% of its fee expenditures (those fees collected by the International), and then assumed that the locals had at least the same proportion of non-chargeable expenses as the International. When considering the permissibility in general ofa local presumption, however, this is a distinction without difference. Finerty stands firmly for the proposition that a union may forego calculation of local-by-local expenditures and rely on overall expenditures to calculate an advance fee reduction. This is all, as a matter of broad principle, that is at issue with respect to the general permissibility of the local presumption.
 
 
 37
 Petitioners strain to suggest that reading Finerty to approve of the use local presumptions creates an intra-circuit conflict, because of this circuit's endorsement of Hudson procedures in the context of private employment relationships. Petitioners' assertion rests on a reading of Hudson that this circuit has rejected, namely, that Hudson requires each individual local to calculate its expenditures to meet the Hudson/Beck requirements. Petitioners seem to suggest that those cases that applied Hudson principles to private employees (e.g., Ferriso and Abrams) by implication instituted a requirement that every level of union hierarchy precisely calculate its expenses. Hudson does not mandate this outcome. The only language that arguably supports this reading of Hudson is the Court's comment that the teacher's union's payment of $2,176,000 (53% of its total expenditures) to affiliated state and national labor organizations required "either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used." 475 U.S. at 307 n.18. This does not preclude the use of a local presumption to explain the calculation of the reduced agency fee; it simply requires this court to inquire whether that explanation is sufficient to meet the overarching requirement of Hudson, that nonmembers receive an "adequate disclosure of the reasons why" they must pay a certain agency fee. Id. at 307.
 
 
 38
 We recognize that some of our sister circuits have approached this question from a different perspective. See Prescott v. County of El Dorado, 177 F.3d 1102, 1108 (9th Cir. 1999) (finding use of local presumption unconstitutional), vacated, 120 S. Ct. 929, reinstated in part, 204 F.3d 984 (9th Cir. 2000); Hohe v. Casey, 956 F.2d 399, 410-11 (3d Cir. 1992) (rejecting a local presumption); Lowary v. Lexington Local Bd. of Educ., 903 F.2d 422, 431 (6th Cir. 1990) (finding a local union presumption unconstitutional). In our view, however, these decisions do not stand for the broad proposition that a local presumption is per se unlawful. See Prescott, 177 F.3d at 1108 (stating that the court did "not decide that each little unit in the [Union's] firmament must necessarily be subjected to a separate verified audit of its expenditures"); Hohe, 956 F.2d at 410 (finding notice inadequate because the union offered no "explanation or justification" for presumption);Lowary, 903 F.2d at 431 (declaring unconstitutional local presumption that operated to shift the burden of proof in arbitration). Nonetheless, the fundamental issue before this court, as even petitioners grudgingly concede in their reply brief, is whether the Board reasonably allowed the use of the local presumption in this case. We turn now to that issue.
 
 
 39
 On the record at hand in this case, we find substantial evidence to support the Board's conclusion that the Union acted within a "wide range of reasonableness," Ford Motor Co., 345 U.S. at 338, and that the Union's use of the local presumption was not arbitrary. The Board found that the Union's use of the local presumption was not "arbitrary, discriminatory, or in bad faith" for two primary reasons. First, the Board found that the Union's reasoning that locals proportionately spend at least as much on representational activities to be "justified under the circumstances." Order, 1999 WL 632712, at *5. Second, the Board noted that the employees could challenge the locals' allocation if they chose, and "the Local will be put to its proof." Id. TheBoard's decision also mentions in passing the Union's suggestion that use of the local presumption reduced accounting and reporting tasks, which the Board has otherwise recognized to be "expensive and time-consuming undertakings." Id. We do not view this passing observation as a principal justification for the Board's decision and we find no support for it in the record. Therefore, we give it no weight in our review of the Board's order.
 
 
 40
 Petitioners argue that, with respect to the first justification, the Board blindly accepted the Union's justification without any substantial evidence to support it. The Board points out that there is in fact evidence in the record to support the Union's assumption that locals almost always spend proportionately more on chargeable expenses than the International. The record contains an audit of Local 6000, and this audit indicates that the local spent 90.66% of its dues on chargeable expenses in 1992, while the International allocated 75.69% of its expenses to chargeable expenses during the same year. The record also contains evidence of local expenditures in 1988; in particular, an arbitrator found that each of five locals spent proportionately more on chargeable activities in 1988 than did the International. See In re International Union & Locals 6000, 723, 571, 699, & 70, United Auto., Aerospace, & Agric. Implement Workers, 94 Lab. Arb. (BNA) 1272, 1294 (1990) (referred to in UAW Resp'ts Response to Notice to Show Cause and Br. in Support of a Grant of Summ. J. to the UAW Resp'ts at 34-35 & n.14, reprinted in App. 193-94).The General Counsel presented no evidence that a local had ever spent less, as a percentage of total expenditures, on chargeable expenses than had the International. Although the cumulative evidence is not overwhelming on this issue, we cannot find that the Board was unreasonable in concluding that the Union acted rationally "on the basis of relevant considerations," Reading Anthracite Co., 1998 WL 726724, at *2, in determining that local unions normally spend proportionately more on chargeable expenses than does the International.
 
 
 41
 Moreover, the Union's organizational structure lends further support to the Board's conclusion that the Union did not arbitrarily presume that the International conducts more nonrepresentational activity than the locals. The International maintains several distinct funds and departments that engage in nonrepresentational activity: the Organizational, Education, and Communication Fund, the Community Action Program, the International Affairs Department, the Community Services Department, and the National Organizing Department. All of the expenditures associated with these International bodies are considered to be non-chargeable to nonmembers.
 
 
 42
 Petitioners offer no good argument to counter the Board's second justification. The reason for this is obvious: the Board's judgment in this case is greatly bolstered by the undisputed evidence on the procedures available to nonmembers to challenge the Union's fee allocation. Even the General Counsel acknowledged that, given the challenge procedure, "the risk of overpayment is minimized." Br. of Counsel for the General Counsel to the NLRB 23, reprinted in App. 288.The Board correctly found that these procedures mitigated petitioners' concerns that any of their payments would be unlawfully used for nonrepresentational activities. Any challenge to the local fee calculation is presented to a neutral arbitrator, appointed by the American Arbitration Association ("AAA"), who considers the challenge according to AAA established procedures. Upon initiation of a fee challenge, the entire reduced fee paid by an objector is held in an interest-bearing escrow account until the arbitrator resolves the challenge. The Union has the burden of proving to the arbitrator that it has accurately calculated the fee reduction, and, unlike in Lowary, 903 F.2d at 431, the Union is entitled to no local presumption during the arbitration proceedings. Inother words, the Union must introduce evidence demonstrating that the chargeable percentage of expenditures for the challenger's local was higher than the national chargeable percentage.
 
 
 43
 Petitioners unconvincingly argue that this procedure puts the cart before the horse, because the thrust of Hudson is that a potential objector should not have to object prior to knowing the basis for the Union's allocation. This is a crabbed reading of Hudson. Hudson requires that the Union provide potential objectors "sufficient information to gauge the propriety of the union's fee." 475 U.S. at 306. The Court clearly contemplated that some estimates would have to be made. The only question here is whether, given the facts presented to the Board, and the procedures adopted by the Union, potential objectors have "sufficient information," not exact information. In this case, the procedures amply protect those objectors who feel that their local spends proportionately more on nonrepresentational expenses than does the International.
 
 
 44
 Moreover, the principle undergirding Hudson and Beck is that a nonmember's funds should not be used by the Union for activities to which he has objection. The procedure adopted by the Union adequately protects nonmember objectors from this outcome. See Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, 466 U.S. 435, 444 (1984) (approving an advanced fee-reduction system and an interest-bearing escrow account for objectors as an alternative to rebate scheme). Indeed, the objection procedure is a perfectly sensible system. The Union's system allows nonmembers who have some reason to question the level of their local's non-chargeable activity to easily raise a challenge, thus forcing the Union to justify its fee allocation. And there is absolutely no risk that the funds collected from any such individuals will be used for non-chargeable activities.
 
 
 45
 Finally, and most importantly, petitioners' crabbed interpretation of Hudson entirely ignores the fact that this case presents a DFR claim. The Court in Hudson was not required to assess a nonmember's objection in connection with a claimed breach of a union's duty of fair representation. And the Court certainly never suggested, either in Hudson or in Beck, that the DFR doctrine changes complexion when applied in a case of this sort. The duty of fair representation protects against bad faith, discriminatory, and arbitrary action by a union against represented employees. Where, as in the instant case, a union uses a rational method to apportion fees and takes positive steps to establish neutral and fair procedures to protect the legal rights of nonmembers, a complainant is hard pressed to show a DFR breach.
 
 
 46
 Given the evidence presented to the Board regarding the available audits of local chapters' expenditures, the structure of the International and its relationship to nonrepresentational expenditures, and the challenge procedure, and given the deferential review mandated by the posture of this case, we are constrained to uphold the Board's conclusion that the Union did not violate its duty of fair representation. We cannot say that the Board erred in finding that the Union's actions were not "irrational" or "without a rational basis or explanation." Marquez, 525 U.S. at 46. The Board was not asked to decide whether the Union's choices were "better or more logical than other possibilities," but only whether the Union "act[ed] on the basis of relevant considerations." Reading Anthracite Co., 1998 WL 726724, at *2. There is substantial evidence to support the Board's finding that the Union did not breach its duty of fair representation. Therefore, this court has no business second-guessing the Board's judgment. As Chief Judge Posner noted in International Ass'n of Machinists, "[i]t is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules fortranslating the generalities of the Beck decision ... into a workable system for determining and collecting agency fees." 133 F.3d at 1015.
 
 III. Conclusion
 
 47
 For the reasons articulated herein, we grant Mr. Gally's petition for review and remand the case to the Board to determine the appropriate remedy. We deny the petition for review regarding the Union's use of a local presumption.