

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-12-2003

# Otto v. PA State Ed Assoc

Precedential or Non-Precedential: Precedential

Docket 01-3858

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Otto v. PA State Ed Assoc" (2003). *2003 Decisions.* Paper 509.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/509

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 8, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3858

MARSHA OTTO; F. NAYLOR EMERY; DENNIS A. ERB;
ROBERT K. GILBERT; JAMES W. LOSSELL; BARBARA J.
MCALLEY; WESLEY S. SEMPLE, On behalf of themselves
and all other non-members similarly situated

v.

PENNSYLVANIA STATE EDUCATION ASSOCIATION-NEA;
NATIONAL EDUCATION ASSOCIATION; SHALER AREA
EDUCATION ASSOCIATION, On behalf of themselves and
all other local associations similarly situated
Appellants

No. 01-4110

MARSHA OTTO; F. NAYLOR EMERY; DENNIS A. ERB;
ROBERT K. GILBERT; JAMES W. LOSSELL; BARBARA J.
MCALLEY; WESLEY S. SEMPLE, On behalf of themselves
and all other non-members similarly situated
Appellants

v.

PENNSYLVANIA STATE EDUCATION ASSOCIATION-NEA;
SHALER AREA EDUCATION ASSOCIATION, On behalf of
themselves and all other local associations similarly
situated,
NATIONAL EDUCATION ASSOCIATION;
GROVE CITY AREA EDUCATION ASSOCIATION;
JANE CAMPBELL; BARBARA LEIBY

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 96-cv-01233)
District Judge: Honorable Yvette Kane

———————

Argued June 27, 2002

Before: AMBRO and STAPLETON, *Circuit Judges*,
and O'NEILL\*, *District Judge*

(Filed: May 8, 2003)

———————

Milton L. Chappell, Esquire (Argued)
W. James Young
National Right to Work Legal
 Defense Foundation
8001 Braddock Road, Suite 600
Springfield, VA 22160

   *Attorneys for Appellants/*
   *Cross-Appellees*

John M. West, Esquire (Argued)
Laurence Gold
Bredhoff & Kaiser
805 Fifteenth Street, N.W.,
 Suite 1000
Washington, D.C. 20005

———————————————————————

\* Honorable Thomas N. O'Neill, Jr., United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Mark P. Widoff, Esquire
Pennsylvania State Education
 Association
400 North Third Street
P.O. Box 1724
Harrisburg, PA 17105

*Attorneys for Appellees/
Cross-Appellants*

---

**OPINION OF THE COURT**

---

AMBRO, *Circuit Judge*:

We consider whether, under the First Amendment, certain expenses incurred by unions may be charged to non-members and whether a local union must obtain independent auditor verification of its charges (and, if so, what kind of verification we require).

The First Amendment affords public-sector employees the freedom not to associate with a labor organization. *See Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 301 (1986) (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 222 (1977)). There are limits to this constitutional freedom, however, in light of organized labor's important role in advancing employment conditions. *Abood*, 431 U.S. at 225-26. Thus, as a means of curing the so-called "free-rider" problem posed by its representation of non-members, a union may charge each non-member employee a fair-share, or agency, fee equal to his or her *per capita* share of the union's expenses arising from its duties as a collective-bargaining representative. *See id.* at 235-36. But a union may not, consistent with the First Amendment, collect fair-share dues to support ideological causes or other expenses insufficiently related to collective bargaining. *Id.*

To ensure that non-members are assessed only for fair-share fees properly chargeable to them, the Supreme Court has ruled that unions must adopt procedural safeguards "carefully tailored to minimize the [First Amendment] infringement." *Hudson*, 475 U.S. at 303. First, the union must provide a non-member with "sufficient information to

gauge the propriety of the union's fee." *Id.* at 306. This explanation of the basis for the fee is often referred to as a "*Hudson* notice." Second, a non-member must have an adequate opportunity to object to the fair-share fee allocation. *See id.* at 307. The two safeguards are linked; without the *Hudson* notice, a non-member would lack a basis for deciding whether to object to a fair-share fee calculation. *Penrod v. NLRB*, 203 F.3d 41, 46 (D.C. Cir. 2000).

When theory meets practice, questions abound. Do the financial information requirements apply to small local unions? How much verification of that information must there be? When a union represents more than one bargaining unit, can that union include, in the fair-share fee assessed to non-members of one bargaining unit, costs associated with another bargaining unit's litigation? What if those bargaining units are in different industries?

## I. BACKGROUND AND PROCEDURAL HISTORY

Shaler Area Education Association ("SAEA") is the exclusive bargaining representative for education professionals employed by the Shaler Area School District. SAEA is the local affiliate of the Pennsylvania State Education Association ("PSEA") — which represents, *inter alia*, both education and healthcare professionals in the Commonwealth — and the National Education Association ("NEA," and collectively with SAEA and PSEA, the "Unions"). During the 1994-1995 school year, the Shaler Area School District employed 355 education professionals, 344 of whom were members of the SAEA (and, thereby, the PSEA and NEA). Because all three Unions provide collective-bargaining services to the plaintiffs' bargaining unit, the eleven non-members paid fair-share fees to the SAEA, PSEA, and NEA pursuant to 71 Pa. Cons. Stat. Ann. § 575 (West 2003).

Seven non-union education professionals brought this 42 U.S.C. § 1983[1] action to challenge the Unions' fair-share fee

---

1. 42 U.S.C. § 1983 states, in relevant part:

procedure and assessments.[2] After the District Court confirmed that the plaintiffs had standing to object to the fair-share fees and the sufficiency of the Unions' *Hudson* notice,[3] the parties filed a joint stipulation of facts followed by cross-motions for summary judgment. The District Court granted partial summary judgment in favor of the plaintiffs, declaring that the SAEA must verify its expenditures through an independent audit and that PSEA[4] could not charge the plaintiffs for expenses incurred in litigation not relating specifically to the plaintiffs' own collective-bargaining unit. However, it also held that the Unions could assess education-professional plaintiffs for non-litigation expenditures related to the Unions' representation of healthcare professionals.

Both parties appealed, and together they present four issues for our review: (1) whether, by filing their complaint, plaintiffs objected properly to the Unions' fees and procedures; (2) whether a local union, regardless of size, must obtain an independent auditor verification of the expenditures listed in its fair-share calculation notice (and,

---

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

2. Six of the named plaintiffs are members of the SAEA-represented bargaining unit. The seventh, Marsha Otto, is a member of the bargaining unit represented by the Grove City Area Education Association ("GCAEA"). While GCAEA was a defendant in the original complaint, it was dismissed from the action in plaintiffs' amended complaint.

3. However, the District Court held that, because the plaintiffs did not use the Unions' arbitration process, they lacked standing to challenge the timeliness of that process. *Otto v. Pa. State Educ. Ass'n-NEA*, 950 F. Supp. 649, 651-52 (M.D. Pa. 1997).

4. The District Court's order refers to PSEA and NEA, though it appears that the Unions argue in their briefing only as to PSEA.

if so, we need to decide at what level of auditor inquiry); (3) whether a union may charge non-members for collective-bargaining-related litigation costs incurred on behalf of another bargaining unit pursuant to an expense-pooling arrangement with that other bargaining unit; and (4) whether a union may charge non-members for pooled resources available to all local affiliates even though some of the affiliates represent employees in different professions. We rule in favor of plaintiffs as to issues one and two (and determine the level of verification required) and the Unions on issues three and four.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Whether plaintiffs properly objected to the Unions' fair-share fee calculation is a question of standing and is subject to *de novo* review. *In re RFE Indus., Inc.*, 283 F.3d 159, 163 (3d Cir. 2002). We also review *de novo* the District Court's grant of summary judgment. *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002).

## III. DISCUSSION

### A. Objection Requirement

The Unions contend that plaintiffs failed to carry their burden of objecting to the fair-share fee calculation by not raising a "contemporaneous objection," *i.e.*, by not objecting at the time of fee collection. Addressing this issue as a question of plaintiffs' standing to sue, the District Court rejected the Unions' contention on the ground that plaintiffs' complaint satisfied the objection requirement. We agree.

No Supreme Court case explicitly establishes a contemporaneous-objection requirement. While *International Association of Machinists v. Street*, 367 U.S. 740 (1961), held that each non-member must *individually* object to disputed fair-share fees, that requirement merely

places the burden on dissenting employees affirmatively to opt out of fees to which they object, rather than allowing them to opt into fees with which they agree. *See id.* at 771 (holding that because the individual *Street* plaintiffs "have in the course of [this action] made known to their respective unions their objection to the use of their money for the support of political causes[,] . . . the respective unions were without power to use payments thereafter tendered by them for such political causes"). Since *Street*, the Court has reiterated that non-members may raise their initial objection in a complaint. *Abood*, 431 U.S. at 239 ("[T]he requirement in *Street* that dissent be affirmatively indicated was satisfied by the allegations in the complaint that was filed.") (citation omitted); *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Exps. & Station Employees v. Allen*, 373 U.S. 113, 119 n.6 (1963) (citing *Street*, 367 U.S. at 771) (employees in Railway Labor Act case "first made known their objection to the [unions'] political expenditures in their complaint filed in this action; however, this was early enough").

Yet the Unions argue that *Hudson* imposed a more onerous notice standard and that "post-*Hudson* cases have implicitly rejected the notion of objection-by-lawsuit." Even assuming *arguendo* that the Unions are correct, the contemporaneous-objection principle they espouse would nonetheless be inapplicable in this case because, as we explain more fully *infra* in Section III.B, "the notice procedures and the fee information given under the plan were inadequate." *Lowary v. Lexington Local Bd. of Educ.*, 903 F.2d 422, 430 (6th Cir. 1990). Thus the plaintiffs lacked sufficient information to formulate a contemporaneous objection.

## B. Independent Auditor Verification

In *Hudson*, the Supreme Court held that a local union representing 27,500 employees and collecting over $4 million in annual dues must provide non-members with "sufficient information to gauge the propriety of the union's fee." 475 U.S. at 306. The Court went on to explain that "[t]he Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, *as well as verification by an*

*independent auditor.*" *Id.* at 307 n.18 (emphasis added). We applied *Hudson*'s independent auditor requirement in *Hohe v. Casey*, 956 F.2d 399 (3d Cir. 1992), and held that the First Amendment required a state-level exclusive bargaining representative for approximately 54,000 employees to obtain independent auditor verification. *Id.* at 415-16. We noted that "the purpose of requiring the verification in the [*Hudson*] notice is to give the nonmembers some prior assurance that the [fair-share] fee was properly calculated," and "[w]hen nonmembers do not receive that assurance, their constitutional rights are violated under *Hudson*." *Id.* at 415.

Today we decide whether *Hudson*'s independent auditor requirement applies to SAEA, a much smaller union than the unions involved in *Hudson* and *Hohe*. Plaintiffs argue that it does. The Unions contend that *Hudson*'s independent auditor requirement was merely *dictum* or applies only to large unions, like those in *Hudson* and *Hohe*, that can afford an independent auditor. They point out that SAEA would spend more on an audit than it collects through fair-share fees. Moreover, the Unions claim that SAEA's finances are so simplistic that non-members can obtain "sufficient information," *Hudson*, 475 U.S. at 306, by examining its documents themselves.

The Ninth Circuit has addressed this issue. In *Prescott v. County of El Dorado*, 177 F.3d 1102 (9th Cir. 1999), *vacated on other grounds*, 528 U.S. 1111 (2000), *reinstated in relevant part*, 204 F.3d 984 (2000), the Court held that, regardless of its accompanying high cost, a state union must conduct a "true audit." *Id.* at 1107-08. However, the Court left unanswered whether the independent auditor requirement applied to a small local union. *Id.* at 1108. ("We do not decide that each little unit in the [state union] firmament must necessarily be subjected to a separate verified audit of its expenditures . . . ."). In a subsequent case very recently decided, *Harik v. California Teachers Association*, Nos. 01-15590, 01-15688, 01-15705, 2003 WL 1873736 (9th Cir. April 15, 2003),[5] the Court provided an

---

5. The Ninth Circuit initially decided *Harik* on August 1, 2002, but withdrew its opinion and substituted a revised opinion on April 15,

answer: an independent auditor verification is not necessary. The *Harik* Court interpreted *Hudson* to require, in the context of a local union with under $50,000 in estimated annual revenues, "*either* [disclosure of] the full financial material necessary to verify [a union's expenditures], *or* an independently sanctioned verification of [ ] the local union's chargeable and non-chargeable expenditures." *Id.* at *4 (emphasis added). Thus, a small local union need only provide sufficient information so that a "nonmember can independently verify that the union spent its money where it claimed that it did." *Id.* In so doing, the Ninth Circuit shifted the burden of expense verification from the union to the nonmember. It reasoned that "[f]or the smallest affiliates, providing financial reports along with full and fair access to bills, check stubs, canceled checks, account balances, and related materials may be more cost-efficient than an external review." *Id.*[6]

---

2003. The earlier opinion held that a small local union must obtain "independent verification" of its expenses, but need not obtain a "formal audit." *Harik v. Cal. Teachers Ass'n*, 298 F.3d 863, 866 (9th Cir. 2002). The Court did not discuss precisely what "independent verification" entails and how it differs from the "true audit" *Prescott* required of larger unions.

6. Additionally, a state case from Massachusetts, *Wareham Education Association v. Labor Relations Commission*, 713 N.E.2d 363 (Mass. 1999), squarely addressed the question before us and held that "there is no exception to *Hudson*'s audit requirement for small local union affiliates." *Id.* at 368. Another state-court case, *Whitley County Teachers Association v. Bauer*, 718 N.E.2d 1181 (Ind. Ct. App. 1999), reached the opposite result, holding that *Hudson* was not violated when a local union did not obtain an independent audit of its financial records. *Id.* at 1191-92. In *Tierney v. City of Toledo*, 824 F.2d 1497 (6th Cir. 1987), the Sixth Circuit wrote that *Hudson* required "an audited, detailed accounting of local union payments to affiliated state and national labor organizations." *Id.* at 1503. However, the Court did not make this statement in the context of a claim that *Hudson*'s requirements should apply differently to a small local union, as is the case here.

In *Andrews v. Education Association of Cheshire*, 829 F.2d 335 (2d Cir. 1987), the Second Circuit also addressed the small union verification issue, but decided the case without resolving it. It determined that "the procedures mandated by *Hudson* are to be accorded all nonmembers of

*Harik* acknowledges that "union costs [for verification] do not trump non-members' First Amendment rights," *id.*, and thus presumably there is no bye from *Hudson*'s requirement of independent auditor verification. But for "smaller unions" (we assume the Court means those with estimated annual revenues between $50,000 and $100,000), it is "confident that [they] can devise flexible and creative 'auditor-verifiable methodolog[ies]', appropriately tailored to provide their nonmembers with a reasonable opportunity for meaningful verification, without depleting the union coffers." *Id.* And "[f]or the smallest affiliates" (we assume those unions with estimated annual revenues under $50,000), *Harik* (as already noted) allows the option of providing financial reports (unaudited and, it appears, lacking any independent auditor oversight) along with "full and fair access" to the underlying financial information. The District Court in that case thus "erred . . . in requiring more than adequate accessible information using an auditor verifiable methodology that could verify [the local union's] expenditures." *Id.* In so doing, *Harik* excises "independent auditor" from *Hudson*'s "verification by an independent auditor," 475 U.S. at 307 n.18, at least "[f]or the smallest [union] affiliates." *Harik*, 2003 WL 1873736, at *4.* Instead, "verification" can mean producing "adequate accessible information using an auditor verifiable methodology." *Id.* We do not find this an available option unless the Supreme Court tells us otherwise.

Were we writing on a clean slate, we might well require something less rigorous for small local unions than

---

agency shops regardless of whether the union believes them to be excessively costly." *Id.* at 339. However, the Court limited this broad statement in a footnote, in which it pointed out that it was not addressing whether or how *Hudson* applies to small local unions because the local union there was one of "three interlocking organizations"— the local union, the state union, and the NEA. *Id.* at 340 n.2 ("[The district court's] opinion implies that *Hudson* might not require an independent auditor if the union involved were small enough. We need not decide the issue here.") (internal citation omitted). While *Andrews* did not provide any basis for us to determine whether the local unions at issue were larger than SAEA, we note that SAEA too is part of "three interlocking organizations" — SAEA, PSEA, and NEA.

independent auditor verification. But the slate is not clean. We are bound by the Supreme Court's decision in *Hudson*, and its directive of "verification by an independent auditor" means just that. *Hudson* implied no intent to make the audit requirement depend on the size of the reporting union.[7] Absent a counter directive by the Supreme Court, we likewise make no exception. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (stating that "[i]f a precedent of this Court has direct application in a case . . . the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)) (alteration in original).

But what level of independent auditor verification does *Hudson* require? Broadly speaking, auditors can provide three different types of accounting services: compilations, reviews, and audits. A compilation is the "lowest level of assurance" regarding an entity's financial statements. Christian Tregillis, *Overview of Services Provided by CPAs, in Basics of Accounting & Finance: What Every Practicing*

---

7. The Unions note that, in the NLRB context, some courts have approved what is known as the "local presumption" — an assumption that the percentage of chargeable to nonchargeable expenses will be the same for the local union as for the parent union. *See, e.g.*, *Finerty v. NLRB*, 113 F.3d 1288, 1292-93 (D.C. Cir. 1997); *see also Thomas v. NLRB*, 213 F.3d 651, 659-60 (D.C. Cir. 2000); *Price v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 927 F.2d 88, 93-94 (2d Cir. 1991) (approving use of local presumption). Courts presented with First Amendment questions in the public employer context have not approved of the local presumption, however. *See, e.g.*, *Lowary v. Lexington Local Bd. of Educ.*, 903 F.2d 422, 431 (6th Cir. 1990); *Prescott*, 177 F.3d at 1108. Whatever the validity of the local presumption, it is irrelevant to the question presented in this case. The local presumption is merely a method for estimating a local union's ratio of chargeable to nonchargeable expenses. At issue here is whether an auditor must verify the total expenses to which that ratio may be applied. *See Hohe*, 956 F.2d at 410 (in a case in which a union attempted to apply the local presumption, holding disclosure to non-members inadequate because "[t]he notice . . . to nonmembers did not disclose the affiliated locals' 'major categories of expenses' nor was there any assertion that the locals' categories of expenses mirrored those of [the state union].").

*Lawyer Needs to Know* 88 (PLI Corp. Law & Practice Course, Handbook Series No. B-1064, 1998). It expresses "neither an opinion nor any level of assurance." *Id.* When performing a compilation, an accountant need not "verify or corroborate the financial statement information provided by the client." Jane Dillard-Eggers, *Understanding Compilations, Reviews, and Audits*, at http://www.tscpa.com/public/smallbusinessarticles/ understanding_compilations.htm.

A review involves an intermediate level of scrutiny in which the auditor provides "limited assurance" on the entity's financial statements. *See id.* In so doing, the auditor indicates that he "is not aware of any material modifications needed to be in conformity with [generally accepted accounting principles, also known as GAAP.]" *Tregillis*, supra, at 88. In order to provide this "limited assurance," the auditor must make some, but not comprehensive, inquiry into client management, accounting practices, internal control structure, and analytical procedures used by the organization. *See* Dillard-Eggers, *supra.* The scope of the "inquiry and analytical procedures are the major difference between a review and a compilation." Larry P. Bailey, *GAAS Guide*: *A Comprehensive Restatement of Generally Accepted Auditing Standards* 16.31 (1994).

In an audit, which provides "the highest level of assurance on financial statements," the accountant "provides *verification* of the financial statements' claims and assertions" and expresses an opinion on the entity's financials. *Tregillis*, supra, at 85 (emphasis added). Among other procedures, the accountant "consider[s] and evaluate[s] . . . the internal control system of the [client] . . . [and] tests . . . the underlying documentation to support account balances." Dillard-Eggers, *supra*; *Bailey, supra*, at 16.51. Annual audits are required for all publicly traded companies. *Tregillis*, supra, at 85.

As between a review and an audit, "[a] review may bring to the accountant's attention significant matters affecting the financial statements, but it does not provide assurance that the accountant will become aware of all significant matters that would be disclosed in an audit." 1 John R.

Clay *et al.*, *Guide to Compilation and Review Engagements* § 101.5 (24th ed. 2002). This is because "a review does not contemplate obtaining an understanding of the internal control structure or assessing control risk; tests of accounting records and of responses to inquiries by obtaining corroborating evidential matter through inspection, observation or confirmation; and certain other procedures ordinarily performed during an audit." *Id.*

We hold that local unions, regardless of their size, are required to obtain audits of their financial statements. Compilations and reviews do not provide an adequate basis for a non-member to decide whether to object to a fair-share fee. *See Prescott*, 177 F.3d at 1107 ("[A]n audit, as opposed to a review, offers at least some verification of the amounts disclosed in the financial statement. . . . We do not see how a mere review of the union's records can offer the 'verification' that the Supreme Court and we have spoken of."). Indeed, "verification"— the word used by the Supreme Court in *Hudson*, 475 U.S. at 307 n.18, and by at least one accounting authority in describing an audit, *see* Tregillis, *supra*, at 85 — means authenticating or confirming the truth or accuracy of a statement. *Webster's Third New Int'l Dictionary of the English Language Unabridged* 2543 (1971). Put another way, an audit "make[s] assurance double sure." William Shakespeare, *Macbeth* act 4, sc. 1, line 96 (W.J. Craig, ed., Oxford 1914). A review does not.[8]

We take no position on the precise procedures an accountant must follow when auditing a local union.[9] Like

8. We recognize that accountants review rather than audit public corporations' interim financial statements, D. Edward Martin, *Attorney's Handbook of Accounting, Auditing and Financial Reporting* § 13.03[1] (4th ed. 2002), and that investors rely on these unaudited interim financial statements when making investment decisions. Despite this industry practice, we believe that, until the Supreme Court tells otherwise, *Hudson* forecloses the argument that a review is acceptable in this context.

9. However, we read literally *Hudson*'s requirement of auditor independence and therefore require that the accountant performing the audit be truly independent of the local union, *i.e.*, not an accountant

the Second Circuit in *Andrews v. Education Association of Cheshire*, 829 F.2d 335, 450 (2d Cir. 1987), and the Sixth Circuit in *Gwirtz v. Ohio Education Association*, 887 F.2d 678, 680 (6th Cir. 1989), we decline to hold either that an accountant's audit procedures must constitute the "least restrictive process imaginable," *Andrews*, 829 F.2d at 340, or that local unions must obtain the " 'highest' possible level of audit service," *Gwirtz*, 887 F.2d at 680. *See generally Prescott*, 177 F.3d at 1107 (noting that audits "may vary in procedures and sampling rates"). We do note, however, that *Hudson* does not require absolute precision within the audit context. *See Hudson*, 475 U.S. at 307 n.18 ("We continue to recognize that there are practical reasons why '[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.' ") (quoting *Allen*, 373 U.S. at 122) (alteration in original).[10]

We recognize that our decision might place high costs on some local unions. But this is how we read *Hudson*'s requirement of "verification by an independent auditor." *Id.*

---

employed in-house by the union. *See Ferriso v. NLRB*, 125 F.3d 865, 871-73 (D.C. Cir. 1997) (holding that *Hudson* requires an auditor to have "independence and qualifications [that] conform to prevailing norms for audits of comparable entities."). *But see Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012, 1017 (7th Cir. 1998) (Posner, J.) (explicitly declining to follow *Ferriso* because " '[i]ndependence' is a slippery term" and cases requiring absolute independence failed to "consider alternatives" and are "in tension with cases . . . that hold that dissenters are not entitled to the highest level of audit services that the market offers").

10. In this vein, we follow other circuits that have held that the independent audit requirement does not require the auditor to verify the local union's classification of expenses as chargeable or nonchargeable. *See, e.g., Dashiell v. Montgomery County, Md.*, 925 F.2d 750, 755-56 (4th Cir. 1991); *Gwirtz*, 887 F.2d at 682 n.3; *Ping v. Nat'l Educ. Ass'n*, 870 F.2d 1369, 1374 (7th Cir. 1989); *Andrews*, 829 F.2d at 340. We agree with these circuits that chargeability is a legal question. *Dashiell*, 925 F.2d at 755-56; *Gwirtz*, 887 F.2d at 682 n.3; *Ping*, 870 F.2d at 1374; *Andrews*, 829 F.2d at 340. To require an accountant to verify that a union has correctly classified expenditures is "tantamount to requiring the auditor to give a second legal opinion," *Dashiell*, 925 F.2d at 756, which is clearly beyond the scope of an auditor's duties.

Further, local unions are not without options. For example, unions without the financial wherewithal to afford the *Hudson*-required audit might choose to enter into combinations with other small unions to achieve necessary economies of scale. In the alternative, state or national unions might choose to subsidize the cost of local unions' audits.

## C. Litigation Expenditures

Plaintiffs' fair-share fees include charges for collective-bargaining-related litigation conducted by PSEA or its affiliates but unrelated specifically to the SAEA unit. Such expenses are known as extra-unit litigation expenses. Plaintiffs contend that the extra-unit litigation expenses at issue are nonchargeable. *See Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exps., & Station Employees*, 466 U.S. 435, 453 (1984) (holding certain litigation expenses not incurred on behalf of non-members' bargaining unit unchargeable to those non-members). The Unions argue that, because the litigation expenses at issue are "pooled" across PSEA affiliates, these expenses are chargeable to non-union members. *See Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 524 (1991) (holding that a union may charge non-members for their *pro rata* share of certain expenses incurred pursuant to a cost-sharing agreement with affiliate unions). This case requires us to address an expense-chargeability issue that lies in the intersection of the *Ellis* and *Lehnert* holdings: whether a union may charge non-members for their *pro rata* share of expenses that relate to litigation *and* that were incurred on behalf of an affiliate union pursuant to a cost-sharing agreement.

As noted, *Ellis* holds that a union may not charge non-union members for certain extra-unit litigation expenses.[11]

---

11. Examples of the disputed litigation expenses in *Ellis* included "the union's challenge to the legality of the airline industry's Mutual Aid Pact, under which a struck carrier receives substantial financial assistance from non-struck carriers; the protection of employees' rights during bankruptcy proceedings involving an employer; the doctrine of fair representation; and the defense of suits alleging violation of the non-discrimination requirements of Title VII." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exps., & Station Employees*, 685 F.2d 1065, 1073 (9th Cir. 1982), *aff'd in part and rev'd in part*, 466 U.S. 435 (1984).

*Ellis*, 466 U.S. at 453 (while expenses of collective-bargaining-related litigation arising from the non-members' bargaining unit are "clearly chargeable" to that employee, "[t]he expenses of litigation not having such a connection with the [non-members'] bargaining unit are not to be charged to objecting employees").[12] But *Ellis* did not involve expenses incurred by an affiliate bargaining unit pursuant to an expense-pooling arrangement with that affiliate. Here, PSEA and its affiliates have agreed to pool their litigation expenses for the unions' mutual benefit. This presents a significantly different question than *Ellis*. Even if a local union party to such an arrangement does not litigate in any given year, it still derives a tangible benefit from participating in an expense-pooling agreement: the availability of on-call resources greater than those it could muster individually. *Cf. Finerty v. NLRB*, 113 F.3d 1288, 1292 (D.C. Cir. 1997) ("It is indisputable that, by pooling its resources on a union-wide basis, a union, which is the bargaining representative of *all* its members, provides some benefit to members of the various local unions.") (emphasis in original). Moreover, it is unclear whether the *Ellis* Court would have reached the same result if the extra-unit litigation at issue were more related to the collective bargaining activities of the *Ellis* plaintiffs' bargaining unit. In other words, it is unclear whether the Court intended to state a *per se* rule against the chargeability of extra-unit litigation expenses.

In *Lehnert*, the Supreme Court held that a union may charge non-union members for their *pro rata* share of expenses incurred on behalf of affiliate bargaining units

---

12. While *Ellis* interpreted the Railway Labor Act ("RLA") rather than the First Amendment, subsequent cases have suggested that RLA cases such as *Ellis* "necessarily provide some guidance regarding what the First Amendment will countenance in the realm of union support of political activities through mandatory assessments." *Lehnert*, 500 U.S. at 516; *see also Romero v. Colegio De Abogados De P.R.*, 204 F.3d 291, 298 (1st Cir. 2000) ("Although the decision [in *Ellis*] turned on a statutory interpretation of the Railway Labor Act, the Court was clear that its interpretation was required to avoid constitutional difficulty. Later cases have interpreted *Ellis* as setting forth constitutional rules . . . .") (internal citations omitted).

when there is "some indication that the payment is for services that may ultimately inure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Lehnert*, 500 U.S. at 524.[13] A majority of the Court in *Lehnert* reached this conclusion by applying a three-part test to assess whether a particular union affiliate's expense is chargeable to non-members of the union. "[C]hargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Id.* at 519.[14] However, when the *Lehnert* Court attempted to apply this test to a question similar to the one before us — whether expenses for reporting on extra-unit litigation, where litigation expenses are incurred pursuant to a cost-pooling agreement with an affiliate union, are chargeable to non-members of the local bargaining unit — no five justices agreed.

Justice Blackmun, joined by Chief Justice Rehnquist and Justices White and Stevens, noted that dissenting employees may not be charged for the costs of union literature reporting on extra-unit litigation because they cannot be charged for such litigation itself under *Ellis*. *Id.* at 528. He acknowledged that litigation conducted by one bargaining unit could establish precedents useful to another bargaining unit. But he concluded that this potential benefit was too attenuated and that "extraunit litigation [is] more akin to lobbying [which is not chargeable] in both kind and effect." *Id.*[15] Were Justice

---

13. The dissent also endorsed this result, even though it would have reached that conclusion through a different analytical path. *See Lehnert*, 500 U.S. at 561-62 (Scalia, J., concurring in the judgment in part and dissenting in part).

14. While this test was in a plurality opinion of Chief Justice Rehnquist and Justices Blackmun, White and Stevens, *see Lehnert*, 500 U.S. at 519, a fifth justice, Justice Marshall, joined the portion of the plurality opinion containing the test*, see id.* at 534 (Marshall, J., concurring in part and dissenting in part).

15. Justice Marshall, who otherwise concurred in Justice Blackmun's opinion, emphasized that *Lehnert* concerned the chargeability of a

Blackmun able to garner five justices' votes for the proposition that extra-unit litigation is not chargeable to non-union members, *Lehnert* would control here. However, as we discuss, he wrote only for a plurality of four.

Justice Scalia, joined by Justices O'Connor and Souter, "agree[d] with the Court's disposition of many of the challenged expenditures," but disagreed with the majority's three-part test for evaluating the chargeability of expenditures. *Lehnert*, 500 U.S. at 550 (Scalia, J., concurring in the judgment in part and dissenting in part). Rather, Justice Scalia would permit expenses to be charged to non-members when those expenses are incurred as part of "the union's statutory duties as exclusive bargaining agent." *Id.* However, he did not apply his preferred test to the question whether dissenting employees could be charged for the expenses of union reporting on extra-unit litigation (or for the expenses of extra-unit litigation itself).

Justice Kennedy, who endorsed Justice Scalia's rather than Justice Blackmun's chargeability test, wrote separately to argue that extra-unit litigation expenditures should be allowed if "undertaken in the course of the union's duties as exclusive bargaining representative." *Lehnert*, 500 U.S. at 563 (Kennedy, J., concurring in the judgment in part and dissenting in part). He criticized Justice Blackmun's reliance on *Ellis* to resolve the question whether costs of reporting on extra-unit litigation are chargeable, pointing out that *Ellis* did not address a litigation-cost-sharing arrangement. *Id.* at 564.

Despite the fact that no five justices explicitly agreed on the chargeability of expenses arising from extra-unit litigation, plaintiffs insist that *Lehnert* controls our disposition of the litigation-expenditures issue. They

union's *reporting* on extra-unit litigation. Chargeability of reporting is different from chargeability of the litigation itself. This disagreement about the scope of the issues before the Court led Justice Marshall to dissent on this issue. He would have held reporting on extraunit litigation expenses chargeable, "particularly since the publication costs at issue are *de minimis*" and involved only "a few pennies." *Lehnert*, 500 U.S. at 534, 546. (Marshall, J., concurring in part and dissenting in part).

contend that because Justice Scalia was clear when he disagreed with the Court's rulings on other expenditures, he must have agreed with Justice Blackmun's position that extra-unit litigation expenditures are not chargeable. We disagree with the plaintiffs' interpretation of Justice Scalia's opinion, for his silence is inconclusive.[16] We are therefore left without definitive Supreme Court guidance. *See Planned Parenthood of S.E. Pa. v. Casey*, 947 F.2d 682, 693 (3d Cir. 1991), *aff'd in part and rev'd in part*, 505 U.S. 833 (1992) (stating that a putative majority standard must "necessarily produce results with which a majority of the Court from that case would agree").

The Sixth Circuit, the Court of Appeals from which *Lehnert* was appealed to the Supreme Court, addressed the issue before us in *Reese v. City of Columbus*, 71 F.3d 619 (6th Cir. 1995). The Court agreed with Justice Marshall that the *Lehnert* plurality's statement on extra-unit litigation expenses was "no more than *dicta*" because at issue was the cost of reporting on extra-unit litigation. *Id.* at 623-24. It then proceeded to find that *Lehnert* not only allowed, but required, it to approve the charges "because a majority [in *Lehnert*] approved of charges for pooled expenses like those in this case." *Id.* at 624. While *Reese*

---

16. We note that application of Justice Scalia's chargeability standard does not necessarily result in the prohibition against pooled extra-unit litigation expenses that Justice Blackmun espoused. A union's incurring extra-unit litigation expenses might, under some circumstances, be "essential to [the union's] discharge of its duties as bargaining agent." *Lehnert*, 500 U.S. at 560 (quoting *Ellis*, 466 U.S. at 448-49) (Scalia, J., concurring in the judgment in part and dissenting in part). Moreover, Justice Scalia's willingness to consider as a chargeable expense an annual fee assessed by a national union to a local bargaining unit to ensure the availability of on-demand services, *id.* at 561-62, suggests that he might also be willing to consider as chargeable a local bargaining unit's *pro rata* share of pooled litigation expenses. That *pro rata* assessment is essentially an annual fee to ensure the availability of litigation resources to the local unit — a form of insurance. We therefore disagree with the Tenth Circuit's conclusion in *Pilots Against Illegal Dues v. Air Line Pilots Association*, 938 F.2d 1123, 1130 n.4 (10th Cir. 1991), that a majority of the *Lehnert* Court would not allow extra-unit litigation expenses incurred pursuant to a pooling agreement to be charged to non-union members.

overstates *Lehnert*'s holding, as the *Lehnert* majority never held extra-unit litigation expenses incurred pursuant to a pooling agreement to be chargeable, we nonetheless agree with the Sixth Circuit's conclusion.

Moreover, in *International Association of Machinists & Aerospace Workers v. NLRB*, 133 F.3d 1012 (7th Cir. 1998), the Seventh Circuit enforced an NLRB decision in which the NLRB rejected as a matter of law the proposition that extra-unit litigation expenses should be treated differently from other extra-unit expenses and instead "appl[ied] the same standard for determining the chargeability of litigation expenses as we are required . . . to apply to all other expenses." *Cal. Saw & Knife Works*, 320 N.L.R.B. 224, 239 (1995). The Seventh Circuit agreed that litigation expenditures are "analytically identical" to other expenditures related to collective bargaining. *International Ass'n of Machinists & Aerospace Workers*, 133 F.3d at 1016.

We too uphold the chargeability of the extra-unit litigation expenses at issue by applying the *Lehnert* majority's three-part chargeability test: "chargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Lehnert*, 500 U.S. at 519. First, that the litigation expenses at issue were incurred pursuant to an expense-pooling arrangement makes the *pro rata* share of those expenses charged to SAEA members and non-members akin to insurance. *See id.* at 523 (noting that because "[t]he essence of the affiliation relationship is the notion that the parent will bring to bear its often considerable economic, political, and informational resources when the local is in need of them," the portion of a local's fair-share fee that "contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year"). The "premium" that SAEA members and non-members pay, in the form of a *pro rata* share of litigation expenses, ensures that the local

bargaining unit will have sufficient resources at its disposal should it need, in the future, to engage in collective-bargaining-related litigation (which would be chargeable to non-union members). Because the extra-unit litigation expenditures at issue ensure the availability of resources for collective-bargaining-related litigation, those expenditures are germane to collective-bargaining activity.

Applying the second prong of the *Lehnert* test, we note that the free-rider concerns applicable to other pooled-expense arrangements apply with equal force to extra-unit litigation expenditures.

Third, extra-unit litigation expenses present "little additional infringement of First Amendment rights beyond that already accepted," *Ellis*, 466 U.S. at 456, where, as here, the pooled litigation resources are expended on collective-bargaining-related activities and "may ultimately inure to the benefit of the members of the local union," *Lehnert*, 500 U.S. at 524. That non-litigation, collective-bargaining-related expenses for, *inter alia*, pooled negotiating advice and informational assistance in *Lehnert* are chargeable to objecting employees informs our conclusion.

Unlike the Justice Blackmun camp in *Lehnert*, we discern no compelling reason to treat litigation expenses incurred pursuant to a pooling agreement differently from other pooled expenses. Thus we conclude that they are chargeable to SAEA's non-members.

## D. Multi-occupational representation

In addition to providing services to education professionals, PSEA's affiliated local associations also provide collective-bargaining-related services to healthcare professionals. When PSEA calculates the expenses chargeable to fair-share payers, it does not allocate chargeable costs by profession. Rather, it includes as part of fair-share fees the expenses incurred on behalf of all represented employees, *i.e.*, educators and healthcare professionals. Plaintiffs argue that the First Amendment bars PSEA from passing onto them costs incurred on behalf of healthcare professionals because PSEA has not shown that those costs "may ultimately inure to [their education

unit's] benefit . . . by virtue of [its] membership in [PSEA]." *Lehnert*, 500 U.S. at 524.

The District Court granted summary judgment in favor of the Unions, holding that the plaintiffs failed to allege facts suggesting that any of the three *Lehnert* requirements were not satisfied (to repeat, that the expenditures are not "'germane' to collective-bargaining activity," not "justified by the government's vital policy interest in labor peace and avoiding 'free riders,'" or that they "significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop"). *Id.* at 519. In so doing, the District Court improperly placed the burden of proof on the plaintiffs when it belonged on the Unions. As *Lehnert* points out, "[t]he union [bore] the burden of proving the proportion of chargeable expenses to total expenses." *Id.*

Because plaintiffs do not challenge any particular expenditures, we evaluate, as a matter of law, whether PSEA may pool costs across occupational groups. We answer this question affirmatively. As discussed above, *Lehnert* held that "a local bargaining representative may charge objecting employees for their pro rata share of the costs associated with otherwise chargeable activities of its state and national affiliates, even if those activities were not performed for the direct benefit of the objecting employees' bargaining unit," so long as there is "some indication that the payment is for services that may ultimately inure to the benefit of the members of the local union by virtue of their membership in the parent organization." *Id.*

In our case, the pooling arrangement confers potential benefits on the plaintiffs. First, the arrangement generates economies of scale that redound to their benefit. Second, by spreading the costs of otherwise-chargeable expenses over a pool of employees whose chargeable-expense levels are not perfectly correlated with their own (*i.e.*, healthcare professionals as well as education professionals), education professionals reduce their risk of being assessed unusually high chargeable expenses in any given year. Moreover, this pooling arrangement does not necessarily increase the dollar amount of chargeable expenses assessed to plaintiffs for any particular year. Just as education professionals are assessed for healthcare professionals' chargeable expenses,

so too healthcare professionals are assessed for education professionals' chargeable expenses. As PSEA correctly points out, this arrangement may result in lower fair-share fees than those assessed in the absence of such an arrangement.

We also note that the *Lehnert* Court did not limit its holding only to bargaining units within the same industry, or within related industries. Instead, it stated a broad principle: "that part of a local's affiliation fee which contributes to the pool of resources potentially available to the local is assessed for the bargaining unit's protection, even if it is not actually expended on that unit in any particular membership year." *Id.* at 523. Though this reasoning was not that employed by the District Court, it nonetheless supports its ultimate grant of summary judgment to the Unions.[17]

* * * * *

We reverse the District Court's grant of summary judgment in favor of the plaintiffs on the issue of charging them fair-share fees for extra-unit litigation expenses. In all other respects, we affirm.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*

---

17. We may affirm for any reason supported by the record, even if not relied on by the District Court. *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000).